JOHN CROCKER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE CONOVER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

A. LOUISE BLACK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60018, 61095, 61096.   Promulgated June 28, 1935.

*Robert P. Vail, Esq.*, for the petitioners.
*Bernard D. Daniels, Esq.*, for the respondent.

## OPINION.

McMahon : The respondent contends that the Maroa Co. was organized as a corporation in 1892 for a period of 20 years; that it operated as a *de jure* corporation in the conduct of a public utility until it forfeited its charter, not later than 1910; and that thereafter the stockholders of the corporation continued to operate as a public utility in the name of the corporation until sold in 1927, and therefore it is taxable as an association within section 2 (a) (2) of the Revenue Act of 1926 and article 1502 of Regulations 69, and in particular within the last sentence of article 1502, which is as follows:

* * * A corporation which has ceased to exist in contemplation of law but continues its business in quasi-corporate form is an association or corporation within the meaning of section 2.

Section 2 (a) (2) has been a part of revenue acts enacted prior and subsequent to the Act of 1926. The above statement appears in substantially the same form in regulations promulgated prior and subsequent to 1926.

It has been repeatedly held that the substantial reenactment in later revenue acts of provisions theretofore construed by the Treasury Department in its regulations is persuasive evidence of legislative approval of the construction contained in such regulations. *Helvering* v. *Bliss*, 293 U. S. 144; *McCaughn* v. *Helvering*, 283 U. S. 488; and *Brewster* v. *Gage*, 280 U. S. 327.

The petitioners contend, however, that under the Illinois law the assets of the Maroa Co., upon forfeiture of its charter, without formal conveyance, became the property of its stockholders, owned by them in undivided shares in proportion to their stockholdings at the time of such forfeiture, as tenants in common, citing *County of Franklin* v. *Blake*, 283 Ill. 292 (119 N. E. 288); and Fletcher Cyclopedia Corporation (1931), sec. 8134; that there was no continuance of a corporate business carried on " in corporate form " after the forfeiture or expiration of its charter, as a *de facto* corporation, with meetings of shareholders and directors, election of directors and officers, keeping of minutes, and the giving of directions to officers as to the management of its corporate affairs; but that the several owners of certain properties, many of which had never been owned by the corporation, merely turned the business over to one of their number and let him run it for them; and that when the properties and business were sold, the owners sold it, made the conveyances and received the proceeds.

In *County of Franklin* v. *Blake*, *supra*, the court merely rejected the common law rule, as applied to a charitable corporation, that upon dissolution of a corporation its lands revert to the grantors or their heirs, and held that the land of such charitable organization for which it had paid escheated to the county and did not revert to the grantors or their heirs. This case is distinguishable from the instant proceeding and is of no aid here.

It has been held that even the entry upon the records of the office of the secretary of state of the cancellation of an Illinois charter for failure to file its annual report does not of itself work a forfeiture of a corporate charter, but is simply prima facie evidence of nonuser which may be availed of by the state as a basis for an appropriate proceeding in a court of competent jurisdiction to forfeit the charter: *Kelly* v. *Lehman*, 130 N. E. (Ill.) 375; *People* v. *Rose*, 69 N. E. (Ill.) 762; Fletcher Cyclopedia Corporations (1931), vol. 16, pp. 757–758.

In Fletcher Cyclopedia Corporations (1931), vol. 8, p. 156, it is stated that " in some states, corporations continuing to exercise cor-

porate powers after expiration of their charter have been recognized as corporations *de facto*, on the ground that there is color of authority ", citing *People* v. *Wayman*, 99 N. E. (Ill.) 941, and *Bushnell* v. *Consolidated Ice Machine Co.*, 27 N. E. (Ill.) 596. In the latter case the Supreme Court of Illinois stated that for the mere exercise of a corporate franchise beyond the period for which a corporation was organized the state alone can complain and that the settled rule of Illinois is that the legal existence of a corporation *de facto* can not be questioned collaterally.

In *People* v. *Wayman*, *supra*, the court held that the relator was entitled to a writ to compel the state attorney to file a petition in *quo warranto* proceedings against a corporation, since it was the only remedy which the relator had to prevent a threatened wrong, as the corporation had commenced condemnation proceedings against the relator in which proceeding the relator could not interpose his defense that the charter of the corporation had expired by limitation. Hence, it appears that a corporation continuing operations as a corporation after the expiration of its charter is recognized as a *de facto* corporation in Illinois.

It is elementary that a *de facto* corporation is entitled to possession of its property until deprived of it by a proper proceeding in a court of competent jurisdiction. Fletcher Cyclopedia Corporations (1931), vol. 8, pp. 186–188.

In *Olmstead* v. *Distilling & Cattle Feeding Co.*, 73 Fed. 44 (Cir. Ct., N. Dist. Ill.), wherein it appears that, pursuant to *quo warranto* proceedings brought in an Illinois court to deprive an Illinois corporation of its charter, a judgment of ouster had been rendered by the state court, the court stated that within the sense of the Illinois statute, the corporation itself became a trustee as soon as the judgment of ouster was rendered; that the property of the corporation thereupon became at once a trust property; that prior to the judgment of the circuit court, the defendant corporation owned its property legally and equitably; and that after the judgment the equitable ownership ceased in the corporation, and became at once vested in the creditors, and, subject to their rights, in the stockholders. Hence, it appears that even after the entry of judgment of ouster an Illinois corporation continues to exist at least as trustee and continues to hold legal title to its property. See *Gulf Lines Connecting R. R.* v. *Golconda Northern R. R.*, 125 N. E. (Ill.) 357.

In *Roe Stephens Manufacturing Co.*, 12 B. T. A. 1254, petitioner was incorporated in May 1886 under the laws of Michigan, for 30 years. After the expiration in 1916 of the charter formal notice of dissolution was filed. From the date of the expiration of the charter to January 1919, when the business was reincorporated, it was con-

ducted in the same manner and under the same corporate name that had theretofore been used, and the same books of account and forms of billheads and letterheads were used. The stockholders, a father, the principal stockholder, and his three sons, considered that they were operating as a partnership after the expiration of the charter. The contention was made by them that the powers of the corporation to do business ended with the term of its corporate existence and thereafter the assets of the corporation belonged to the stockholders as tenants in common, and several cases were by them cited in support thereof wherein it was held that the relations of stockholders in an expired corporation are analogous to those of partners. The Board stated that those cases dealt with a rule of property and not a rule of taxation and were not determinative of the issue presented, citing *B. F. Joel*, 9 B. T. A. 1027, and *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110, wherein the Supreme Court of the United States stated that the power of Congress to tax associations is not affected by the fact that, under the law of a particular state, the association can not hold title to property, or that its shareholders are individually liable for the association's debts, or that it is not recognized as a legal entity. Hence, even if, as contended by petitioners herein, under the Illinois laws, ownership of all the corporate property vested in the stockholders immediately upon forfeiture or expiration of the charter, this would not be controlling under the facts and issue presented herein. *Pierce Oil Corporation*, 32 B. T. A. 403.

While it appears that after the expiration the business was conducted and managed solely by John Crocker in his own discretion, that no stockholders' or directors' meetings were held, and that no officers were elected and no minute book kept, there is no showing that the business was not conducted and managed by John Crocker in the same manner prior to the forfeiture or expiration of the charter as it was conducted thereafter. On the contrary, the facts indicate that the business may have been conducted prior to the forfeiture in the same manner as thereafter and that John Crocker was in control thereof. The members of his family apparently looked to him in the management of their affairs. John Crocker was in the banking business at Maroa, Illinois. He acted as executor for his mother's estate and also for the estate of George L. Crocker, his brother. Instead of using the formalities inherent in corporate entities, the stockholders, all except two members of the same family, permitted one of them to conduct the affairs of the corporation in his discretion, no doubt in the realization that under all the circumstances a more strict adherence to corporate form would be a mere idle gesture and waste of time and energy.

It is to be noted that although the Maroa Co., in its annual report to the Illinois Commerce Commission, stated that it was " subse-

quently disincorporated" and had no directors, and although it is stated in the application to that commission for authorization of the sale of its property to the Illinois corporation that the business was originally the property of the Maroa Co., but such company had not been kept in good standing and had consequently been dissolved, the commission in its order of November 10, 1927, found, after a hearing, that the Maroa Co. in 1927 was a corporation duly organized and existing under and by virtue of the laws of Illinois and that it owned and operated an electric utility in Maroa, Illinois, and was duly authorized by its articles of incorporation so to do.

In *Waldron Co.*, 2 B. T. A. 715, wherein it appears that the business of an individual which had been incorporated was carried on thereafter without formality of corporate meeting, the individual dictating and directing the conduct of the business at all times, sometimes purchasing merchandise in the corporate name and sometimes in the name of the individual, it was held that the business was the business of the taxpayer corporation. In *R. L. Brown Coal & Coke Co.*, *infra*, the Board held that even if not legally organized to carry on business with the public under the laws of the State of Kentucky, the record warranted the conclusion that the corporation was an association and required to make returns as a corporation for the years in question.

In *Joseph E. Swanson et al., Trustees*, 29 B. T. A. 1123, we held that a quasicorporate form of organization is not a controlling factor or an indispensable element of an association, pointing out " that each case must be determined upon its own peculiar facts."

In our opinion the Maroa Co., was in 1927 an " association " within the provision of section 2 (a) (2) of the 1926 Act and article 1502 of Regulations 69.

We now return to the question whether the petitioners are transferees of the Maroa Co. The petitioners contend that they and other stockholders of the Maroa Co., and not the Maroa Co., were the owners of all of the property sold in 1927 and hence the distribution received was received as owners of the property sold and not as transferees of the Maroa Co. This contention is based solely upon the ground that upon forfeiture or expiration of the charter of the Maroa Co., its title thereto vested, without formal conveyance, in the petitioners and other stockholders. As heretofore stated, under the laws and decisions of Illinois, the state alone can question the legal existence of a corporation organized under its laws. There is no evidence showing that the Maroa Co. was ever dissolved voluntarily or by a proceeding instituted for that purpose. It continued to conduct its business without material change in the name of the Maroa Co. until the sale in 1927. Hence any property held by it at the time of forfeiture or expiration of its charter and not

disposed of by it and constituting a part of the property sold in 1927 remained the property of the Maroa Co. up to the sale in 1927. It was stipulated that prior to 1910 the Maroa Co. owned the 34 by 60-foot lot on which the original plant and equipment were located. The Maroa Co. made no formal transfer of any of its property to its stockholders or any of them, and this lot, plant, and equipment constituted a part of the property sold to the Illinois Corporation. No transfer of this property having been effected in any way after the forfeiture or expiration of the charter of the Maroa Co., this property belonged to the Maroa Co. at the time of the sale in 1927. The original franchise to operate a public utility and the original contract to light the streets of Maroa were secured by John Crocker and assigned by him to the Maroa Co. The new franchise to operate a public utility and the new contract to light the streets of Maroa, which were sold or assigned to the Illinois Corporation, were secured by John Crocker in his name in 1909. However, when he secured these, the old franchise and the old contract had some four years to run. There is no showing that the Maroa Co. was compensated in any way for the cancellation of the old franchise and contract or that they were canceled on account of any breach thereof on the part of the Maroa Co. Furthermore, it was stipulated that the new franchise and contract were held and used by John Crocker for the benefit and use of the "same persons who had owned and/or controlled Maroa Electric Light Company in the same proportion as their interests therein." It is apparent therefore that John Crocker personally did not own the new franchise and contract. It is reasonable to infer from the whole record that the new franchise and contract merely took the place of the old franchise and contract, since the Maroa Co., although the old franchise and contract assigned to it were canceled, continued to operate and conduct its public utility business after their cancellation in 1909 until 1927, when the sale occurred.

It was further stipulated that "in 1910" the transformer and switches were installed on a 16 by 30-foot lot "owned by John Crocker", adjoining the 34 by 60-foot lot, and "in a small building erected by him." However, it was also stipulated that "*At the time of the sale (1927)*" the interest of John Crocker in the business and property sold, which included this 16 by 30-foot lot and building, amounted to 58/120 thereof. It also appears from the agreement of sale made with the Illinois Corporation that John Crocker represented to the Illinois Corporation that he owned only an undivided interest in the property agreed to be sold, which included this 16 by 30-foot lot and building; that all the property sold to the Illinois Corporation, including this 16 by 30-foot lot and building thereon, was and had been used in the business of the Maroa Co.; that it was sold as a unit

with the public utility business operated and conducted by the Maroa Co.; and that all this was paid for as a unit. No part of the sale price was treated as belonging to John Crocker or any of the other shareholders, but as belonging to the Maroa Co., subject first to the payment of its obligations. Furthermore, no claim is made by petitioners that respondent has omitted from the basis used in determining the profit realized on the sale of the property, including the 16 by 30-foot lot and building thereon, the cost or value of this 16 by 30-foot lot and building thereon. There is no dispute as to the basis used by him for tangibles. The only question raised by petitioners as to the amount of the deficiency is that the respondent failed to include in the basis any value for intangibles. Furthermore, the statement attached to the report of the findings of the internal revenue agent in charge dated May 15, 1930, petitioner's exhibit 1, containing an explanation of the changes or adjustments made in the taxable income of the Maroa Co., indicates that the 16 by 30-foot lot and building thereon were carried as an asset on the books of the Maroa Co. and that the account of John Crocker on such books was credited with the amount of $615 representing the sale price of such lot. The action taken by John Crocker in first paying the corporate creditors out of collections, if any, and the $60,000 received from the Illinois Corporation before distributing the balance to the stockholders, including himself, shows that all those interested as stockholders in the Maroa Co. regarded all the property sold to the Illinois Corporation as the property of the Maroa Co., in which they had an undivided interest in proportion to their stockholdings, subject to the payment of corporate debts. Furthermore, the sale of the properties and business of the Maroa Co. was consummated in 1927. Ordinarily gain realized from the sale of property is returnable and taxable to the owner in the year in which the sale is consummated. In *John Crocker*, Docket No. 53974, the disposition of which, upon stipulation, is dependent upon the decision herein, it is alleged in the petition that John Crocker in his return for 1928 reported a capital gain of $10,308.48, representing his share of " a realization from the sale in 1928 " of properties and business operated under the name of the Maroa Co., in which he held a 58/120 interest. This reflects the distribution to him in 1928 of his proportion of net proceeds from the sale in 1927. Hence, John Crocker did not return the profit in 1927, the year of the sale, as he should have done had he regarded himself as owner thereof, but in 1928, when he received his share of the distribution. This action on the part of John Crocker leads to the same conclusion.

While John Crocker may have owned the 16 by 30-foot lot and building thereon in 1910, the whole record leads to the unavoidable conclusion that he did not own the 16 by 30-foot lot and building thereon *in 1927*, but that John Crocker's interest therein was that

of a stockholder in proportion to his stockholdings, and that the Maroa Co. owned it *in 1927*. Cf. *Taylor Oil & Gas Co.* v. *Commissioner*, 47 Fed. (2d) 108, affirming 15 B. T. A. 609; *Hellebush* v. *Commissioner*, 65 Fed. (2d) 902, affirming 24 B. T. A. 660; *Boggs-Burnam & Co.* v. *Commissioner*, 71 Fed. (2d) 999, affirming 26 B. T. A. 988.

Furthermore, there is no showing of a landlord and tenant relationship between the Maroa Co. and its stockholders. The fact that the Maroa Co. executed no conveyance is of no significance in view of the fact that all of its outstanding certificates of stock were transferred to the purchaser as required by the agreement of sale, the purchaser thereby becoming the sole stockholder of the Maroa Co.

*R. L. Brown Coal & Coke Co.*, 14 B. T. A. 609, cited by the petitioners, is distinguishable from the instant proceeding on the facts. It may be pointed out that in that case the intention was to form a corporation *to operate* a coal mine on property, in which property R. L. Brown had acquired a leasehold interest in 1918. Although the corporate charter was obtained in 1919 and the corporation operated the coal mine on such property, the lease was never conveyed to the corporation. In the instant proceeding the Maroa Co. owned at the time of sale all the property sold. While it was stipulated that John Crocker owned the 16 by 30-foot lot and building thereon in 1910, it was also stipulated that at the time of sale *in 1927* he had only a 58/120 interest, represented by his stockholdings, which stipulation, together with other evidence presented, clearly establishes that ownership of this lot and building was transferred from him to the Maroa Co. prior to 1927. Furthermore, in *R. L. Brown Coal & Coke Co., supra*, the Board stated that "The evidence indicates that R. L. Brown received no liquidating dividend from the corporation in 1921", whereas in the instant proceeding the evidence shows that John Crocker, after paying the debts of the corporation, made distribution to himself and the other shareholders of all moneys remaining in 1928, the year after the sale, as a corporation ordinarily makes a liquidating distribution.

On brief petitioners state that in *W. H. Reisner Manufacturing Co.*, 13 B. T. A. 841, and *United States* v. *Board*, 14 Fed. (2d) 459, where both the capital stock and assets were transferred, it was held that the gain arose out of the sale by the stockholders of their stock and not out of the sale by the corporation of its assets. Those cases are not applicable here, since the contract of sale herein is not ambiguous and clearly shows that the thing contemplated therein to be sold was "the property constituting the electric plant and distribution system", consisting of and including "the real estate hereinafter described, each, all and every part of the plant, distribution system, transformers, meters, lighting equipment, materials and sup-

plies, franchises, licenses and easements, and all structures and appliances constituting, held for and/or operated as a part of or in connection with, the said electric utility in and about the City of Maroa, Illinois ", and that the certificates of stock were to be assigned and transferred " for the purpose of effectuating such sale and conveyance of said property." As we construe the agreement of sale, it was primarily a sale of the property of the corporation and the passing of the shares was merely incidental to the sale of the assets " for the purpose of effectuating such sale and conveyance ", putting the title beyond recall or controversy on the part of the Maroa Co. That John Crocker entered into the agreement of sale with the Illinois Corporation and received the check is immaterial here, as the Maroa Co. could not act except through John Crocker, who had been and was authorized to act for the Maroa Co. and to conduct its affairs in his sole discretion. We look to the substance of the transaction rather than the form and the latter must yield to the former.

Since the Maroa Co. owned all the assets sold *in 1927* and distributed all its funds remaining after the payment of its debts to its shareholders in 1928, leaving it without assets to pay its tax liability for 1927, and since the petitioners received without consideration amounts in excess of the deficiency of $6,255.77 involved herein, they are transferees of the Maroa Co.

The next question to be considered is whether the profit realized by the Maroa Co. from the sale in 1927 of all its property is correctly computed or determined by the respondent.

The respondent in computing such gain used as a basis the book value of the tangibles only in the amount of $8,683.66. There is no dispute about the basis used for the tangibles. However, the petitioners contend that the intangibles, consisting of a franchise to operate a public utility and a contract to light the streets of Maroa, both obtained in 1909 for a term of 24 years, and a contract to purchase electricity at wholesale to be distributed at retail, had a value as of March 1, 1913, of at least $22,223.40 and at most of approximately $40,000.

Section 204 (b) of the Revenue Act of 1926 provides that the basis for determing the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be "(A) the cost of such property * * *, or (B) the fair market value of such property as of March 1, 1913, whichever is greater."

No value was assigned to the intangibles on the books of the Maroa Co. at any time. Nothing was paid for these contracts so far as the record shows.

The respondent determined that the intangibles had no value as of March 1, since the average profit from 1908 to 1912, inclusive, of $684.76 equaled approximately only a 5 percent return upon the aver-

age tangible investment over the same period of $13,477.19. In determining the average profits the respondent deducted from the profit of each year used in his computation $620 for depreciation, as no depreciation had been taken on the books of the Maroa Co. from 1908 to 1913. Obsolescence and accrued depreciation were taken out of capital and surplus in December 1913.

It is contended by the petitioners that the respondent, in determining the value of the contracts involved, included, in his computation of the average profit, profits of years prior to 1910 in which such contracts had not been acquired; that it was not until October 14, 1910, that it began operation under its new contracts and ceased to generate its own electricity; and that therefore the average profit used by him did not correctly reflect profits resulting from such contracts. It is further contended that the respondent in his computation of the average investment used the book value of the capital and surplus as of January 1 of each year from 1908 to 1912; that due to the fact that property scrapped in 1910 was not charged off until late in 1912 the books did not correctly reflect the investment; and that the respondent also erred in deducting from profit depreciation on all depreciable assets, including those scrapped as well as those used after 1910.

The parties stipulated as to the profits and depreciation deductible therefrom from 1908 to 1913, inclusive, and from 1922 to 1926, inclusive, the value of the tangibles before October 14, 1910, the value of those used thereafter, and also the value thereof as of other dates, but in view of the conclusion reached herein, we deem it unnecessary to set them forth herein.

The petitioners computed the minimum value attributed to intangibles of $22,223.40 as follows:

| | |
|---|---:|
| Average investment, tangibles only, 1911–1912 | $7,277.91 |
| Return thereon at 5% | 363.89 |
| Average profits, 1911–1912 | 1,919.51 |
| Profits due to intangibles (difference between $1,919.51 and $363.89) | 1,555.62 |
| Profit due to intangibles capitalized at 7% | 22,223.40 |

which computation, it is argued, is in accord with A. R. M. 34, C. B. No. 2, p. 31. There is no general rule for the determination of the value of intangibles. While the Committee on Appeals and Review of the Bureau of Internal Revenue in A. R. M. 34 suggested certain methods as an aid in this respect, it stated that it was unable to lay down any specific rule of guidance for determining the value of intangibles which would be applicable in all cases and under all circumstances. However, the methods suggested in A. R. M. 34 do not contemplate a return of only 5 percent on tangibles, as used by the petitioners in their computation of the value of the intangibles.

The evidence herein shows that the Maroa Co. commenced to operate as a distributor on October 14, 1910, under its new franchise and

contract with the city of Maroa secured in 1909 and its contract with the predecessor of the Illinois Corporation. These contracts are not in evidence. It is contended on brief that the business immediately began to make profits instead of losses and such profits are attributed to such contracts. The original franchise and the new franchise granted the right to the Maroa Co. to operate a public utility in Maroa. Under the old contract the Maroa Co. agreed to light the streets of Maroa with arc lights and under the new contract it agreed to use incandescent lights. Prior to October 1910 it generated its own electricity and thereafter it purchased the electric current for distribution. So far as we know the terms of the old and the terms of the new franchise are the same except as to their effective period of time. The terms of the old and the terms of the new contract with the city to light its streets, so far as we know, are the same except that the first probably provided for lighting the streets with arc lights and the second probably provided for lighting the streets with incandescent lights. While it appears that the population of Maroa in 1910 was 1,160, we do not know the number of customers of the Maroa Co. or the rates charged them by such company before and after the cut-over from generated to purchased current, which occurred on October 14, 1910. We observe that Maroa's population was 1,154 in 1930, remaining practically static for 20 years. Since the old and new contracts, so far as the record discloses, are substantially alike, it can not be assumed that the increased profits are directly traceable to them. Nor does the record disclose the terms and provisions of the contract with the predecessor of the Illinois Corporation. From the evidence submitted we are unable to say that it had any greater or other value than any other ordinary agreement to purchase commodities dealt in in any other business. Any formula for determining value based upon profits is of little, if any, aid where such profits are not, at least to some degree, traceable to the property the value of which is in question. See *Charles W. Ballard*, 25 B. T. A. 591. From the evidence presented it is reasonable to infer that the increase in profits resulted from the change in the business itself brought about by the change from producer to purchaser of electric current, for distribution.

From the evidence before us we are unable to determine that these intangibles had any value on March 1, 1913, and hence we are unable to fix or find a value or values therefor as of that date to be used as a basis for the determination of gain or loss and thus the determination of the respondent, which is presumed to be correct until shown to be erroneous, can not be disturbed.

Reviewed by the Board.

*Decision will be entered for the respondent.*